United States District Court
Southern District of Texas

**ENTERED**

July 29, 2025
Nathan Ochsner, Clerk

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| W.H., by and through his next friend, LARRY G., | § § § | |
| *Plaintiff,* | § § | |
| VS. | § § | CIVIL ACTION NO. 4:24-CV-1515 |
| FORT BEND INDEPENDENT SCHOOL DISTRICT, | § § § | |
| *Defendant.* | § § | |

**<u>MEMORANDUM & ORDER</u>**

Plaintiff W.H., by and through his next friend Larry G., filed this appeal from an administrative due process hearing under the Individuals with Disabilities Act, 20 U.S.C. § 1400, *et seq.* ("IDEA"). The Hearing Officer upheld Defendant Fort Bend Independent School District's proposal to place W.H. in the resource setting for Math as consistent with providing a free appropriate public education in the least restrictive environment but overturned the proposal to place W.H. in the resource setting for English. In addition to his appeal of the due process hearing, W.H. asserts a claim under Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, against Defendant Fort Bend Independent School District.

Before the Court are Defendant's Motion for Judgment on the Administrative Record and Motion for Summary Judgment (ECF No. 18) and Plaintiff's Motion for Judgment on the Administrative Record (ECF No. 19). For the reasons that follow, the Court finds that Defendant's Motion for Judgment on the Record should be granted, and Plaintiff's Motion for Judgment on the Administrative Record should be denied. In short, the Court upholds W.H.'s placement in the

1

resource setting for both Math and English. The Court further finds that Defendant's Motion for Summary Judgment on Plaintiff's Section 504 claim should be granted.

## I.    BACKGROUND

Plaintiff W.H. is a sixteen-year-old high school student with disabilities who attends school in the Fort Bend Independent School District ("FBISD"). W.H. has attended schools in FBISD since third grade and has received special education services the entire time. He is eligible for special education services as a student with specific learning disabilities in basic reading skills, math calculation, and written expression, identified as having dyslexia. R. 712. W.H. appeals from a partially adverse due process hearing decision issued with respect to his Individualized Education Program ("IEP") for the 2023-24 school year.

### a.    Fourth Grade, Fifth Grade, and Sixth Grade

In February 2019 while in the fourth grade, W.H. received an Independent Educational Evaluation ("IEE") from the Luke Waites Center for Dyslexia and Learning Disorders at the Texas Scottish Rite Hospital for Children. R. 212-229. The IEE concluded that W.H. had several learning deficiencies including specific learning disorders with impairment in reading, written expression, and mathematics. R. 220. The evaluator also recommended that the "the school consider increasing the amount of special education support provided to [W.H.] as related to skills involving reading, written expression and mathematics. This might include providing instruction for these key academic areas in a resource setting and provided by a special education teacher." R. 221.[1]

In December 2019 while in the fifth grade, W.H. received a Full and Individual Evaluation from a multidisciplinary team ("FIE"). At the time of the evaluation, W.H. received his instruction

---

[1] Resource setting is a term for a self-contained special education classroom which is distinct from in-class support by special education teachers in a general education classroom.

in the general education setting with accommodations and in-class support from special education teachers. R. 233, 254. The FIE confirmed that W.H. met eligibility requirements for special education services as a student with a specific learning disability in basic reading skills with dyslexia, written expression with dysgraphia, and math calculation. R. 285. The FIE also recommended numerous accommodations and assistive technologies for W.H. R. 283-287. Many of the recommended accommodations and assistive technologies were implemented in W.H.'s subsequent IEPs.

While in the sixth grade, W.H.'s Present Level of Academic Achievement and Functional Performance (PLAAFP) showed that, over the first three terms of the school year, he received only one term grade under 90 which was a grade of 88 in English Language Arts (ELA) during Term 1. R. 442. However, W.H.'s performance on the Renaissance 360, a universal assessment administered by FBISD three times each school year to track student progress, contrasted sharply with his grades. At the beginning of sixth grade, W.H. took the Renaissance 360 Reading Test and scored in the 1st percentile nationally among his sixth-grade peers. R. 443. In the middle of the year administration, W.H. placed in the 3rd percentile nationally, and in the end of year administration, he placed in the 6th percentile nationally. R. 443; R. 328. At the beginning of sixth grade, W.H. also took the Renaissance 360 Math test and scored in the 1st percentile nationally among his sixth-grade peers. R. 444. In the middle of the year administration, W.H. placed in the 2nd percentile nationally, and in the end of year administration, he again placed in the 2nd percentile nationally. R. 443, 328. W.H. received extra time to answer each question on all the Renaissance 360 administrations but no other accommodations. R. 442-43. In the spring of sixth grade, W.H. also took the State of Texas Assessment of Academic Readiness (STAAR) with accommodations, and his report card revealed that he did not meet grade level in either Reading or Mathematics. R.

790. He was at the 15th percentile in Reading and at the 13th percentile in Mathematics for sixth grade students in Texas. R. 791. Yet, W.H. had made the "Expected Progress" from his STAAR results in 2019. *Id.*

### b. Seventh Grade

On April 5, 2021, W.H.'s Admission, Review, and Dismissal ("ARD") committee met for the annual review of his IEP before W.H. began seventh grade in the 2021-2022 school year. R. 441-85. The ARD committee proposed and adopted sixteen accommodations for W.H. including assistive technologies, calculation aids, simplified instructions, extra time, small group administration of tests, oral administration of assignments and tests, and copies of teacher notes. R. 447-48. While evaluating the least restrictive environment for W.H., the ARD committee considered resource room placement but did not make the placement. R. 453. Instead, W.H.'s IEP placed him in the general education classroom with in-class support for ELA, Math, Science, and Texas History and in a special education setting for Basic Reading services related to his dyslexia. R. 447. The ARD committee agreed that the IEP proposed the least restrictive environment to meet W.H.'s educational needs. R. 459. On May 24, 2021, the ARD committee met again to discuss compensatory services for W.H. R. 486-501.

In September 2021 while in the seventh grade, W.H. received another FIE at his guardian's request. R. 295-358. W.H.'s guardian requested the reevaluation "(a) identify and describe his strengths/assets and weaknesses/needs and educational performance levels, (b) determine the presence or absence of any educational disability condition(s), (c) identify and describe the student's educational needs, and (d) provide data that will assist the ARD committee in its deliberations regarding eligibility and educational programming." R. 295. The FIE determined that, over the past three years, W.H.'s Reading and Math standardized test scores demonstrated a

pattern where the scores would start out low and improve before regressing to a lower level and showing a need for urgent intervention. R. 329-30. The FIE confirmed that W.H. met the requirements for a specific learning disability in basic reading, math calculation, and written expression but concluded that he did not meet eligibility criteria for autism. R. 346. The FIE concluded with recommendations for additional accommodations for W.H. R. 350-51.

On November 5, 2021, the ARD committee met to review the September 2021 FIE and propose updated IEP goals. R. 504-27. W.H.'s guardian was not in agreement with the FIE and requested a new IEE. R. 514. The committee agreed to increase W.H.'s inclusion support minutes to full support for all core content classes, including ELA and Math, and agreed on proposed IEP goals. *Id.* W.H.'s guardian proposed that the committee adopt a seven-step process for providing simplified instructions in Math, but the ARD committee did not reach consensus on that proposal. R. 514-15. The ARD committee held additional meetings on November 19 and November 29, 2021 to discuss the proposed math plan. R. 528-550.

In seventh grade, W.H. averaged a 90 or above in all of his classes over the course of the year, but he had individual term grades below 90 in Math, Science, and Basic Reading. R. 794. At the beginning of seventh grade, W.H. scored at the 9th percentile nationally on the Renaissance 360 Reading Test. R. 1204. In the middle of the year, he placed at the 4th percentile nationally, and at the end of the year, he placed at the 5th percentile nationally. *Id.* His instructional reading level declined from 3.9 to 3.5 over the course of the school year. *Id.* On the Renaissance 360 Math Test, W.H. scored at the 3rd percentile nationally at the beginning of the year, at the 5th percentile nationally in the middle of the year, and at the 4th percentile nationally at the end of the year. *Id.* On STAAR, W.H. did not meet grade level in Reading or Math. R. 792. He was at the 14th percentile in Reading and at the 8th percentile in Math for seventh grade students in Texas. *Id.* It is

5

difficult to interpret W.H.'s progress on his IEP because many entries are repeated, but the Hearing Officer found that W.H. made "mixed progress in his IEP goals across the 2021-22 school year. JX 39, JX 40." R. 5.

### c. Eighth Grade

In March 2022, the ARD committee met for the annual review of W.H.'s IEP before the 2022-2023 school year. R. 551-634. W.H.'s PLAAFP stated that his independent reading skills were at the fourth-grade level while his math skills were at the third-grade level. R. 552-554. W.H.'s guardian advocate was concerned that W.H. was not making progress in the general education setting and suggested that the committee consider altering W.H.'s placement to "a more supported setting." R. 589-90. Although the ARD committee again considered resource room placement, the committee declined to make the placement. R. 583, 589-592. Instead, the committee continued to place W.H. in the general education classroom with in-class support for ELA, Math, Science, and US History and in a special education setting for Basic Reading services related to his dyslexia. R. 576. Among W.H.'s accommodations, the ARD committee included a seven-step math plan for providing W.H. with simplified instructions: 1) Support staff or teacher will read the directions to the class, 2) Student will articulate his understanding using the success criteria, 3) Support staff will explain the directions using simplified vocabulary. Pre-taught content vocabulary will be reviewed; 4) Student will repeat simplified directions; 5) If multiple steps, support staff will bullet out the steps in order; 6) Student will execute steps needed to complete the task; 7) Support staff will check for understanding prior to student beginning the task, and at different points during the assignment. R. 574.

The ARD committee briefly reconvened on April 19 before rescheduling to May 3. R. 591-592. On May 3, the ARD committee met to review W.H.'s PLAAFP and discuss the recommended

IEP goals and accommodations for the upcoming year. R. 592-596. During the meeting, FBISD's Special Education representative, Mr. Barker, suggested that W.H. might benefit from education in a "smaller setting." R. 594. On May 20, the ARD committee met again and agreed to goals and accommodations for the upcoming school year. R. 596-599. The ARD committee recommended that W.H. receive Extended School Year services for reading and math, but W.H.'s guardian declined to enroll him. R. 599.

During summer 2022, W.H. received an IEE from Dr. Dana Kelly, a licensed psychologist specializing in school psychology, at his guardian's request. R. 359-411. Dr. Kelly administered the Kaufman Test of Educational Achievement, Third Edition and found that "his academic scores on the KTEA-3 were all below average." R. 400. His Reading Composite score was at the 5th percentile and fourth-grade level. R. 376.  His Math Composite score was at the 1st percentile and second-grade level. *Id.* Dr. Kelly determined that W.H. continued to meet the criteria for specific learning disability and additionally met the criteria for speech impairment and autism. R. 401-05. Her recommendations for interventions and accommodations largely mirrored W.H.'s existing IEP with additions for speech and language therapy. *See* R. 408-11. Dr. Kelly said W.H. "would likely perform well in a general education class setting with in-class support and supplemental interventions and reteaching as needed." R. 408. She went on to explain that he performed best in a "high structure" environment with "a teacher who will be interactive with him, frequently checking in with him and monitoring his understanding and performance." *Id.*

On September 9, 2022, W.H.'s ARD committee met to review the new IEE results. R. 641-85. The school-based committee members did not agree with the IEE that W.H. met the criteria for autism or speech impairment. R. 659-60. FBISD staff recommended that W.H. be placed in the resource setting for Math, but W.H.'s guardian was concerned that FBISD's proposal was not

based on sufficient data. R. 660. He felt that the resource setting would not be necessary as long as W.H.'s IEP was implemented with fidelity. *Id.* On September 16, the ARD committee reconvened to discuss proposed new math goals as well as concerns that W.H.'s guardian had about test administration and accommodation logs. R. 661-662. FBISD again proposed resource placement in Math. *Id.* The committee was unable to reach agreement on math goals or placement in the resource setting. *Id.* On October 3, the ARD committee reconvened and agreed on proposed Math and Reading goals as well as three additional accommodations. R. 678.

On October 14, the ARD committee met to discuss concerns brought by W.H.'s guardian. R.690-691. W.H.'s guardian explained that W.H. needed two days to complete tests and asked that FBISD not give tests on Fridays or Mondays so he would not have a gap in test-taking. *Id.* FBISD staff explained that it was not possible to ensure that tests would not occur on Friday, and if W.H. took two days on all tests, he could miss instruction on new content. *Id.* The committee also noted that W.H.'s accommodations already included an additional class period for tests. *Id.* W.H.'s guardian emphasized that W.H. was an A student, so he did not understand why a resource setting was necessary. *Id.* FBISD staff explained why they felt a resource setting would help W.H. progress. *Id.* The meeting ended without agreement.

On February 1, the ARD committee reconvened to discuss supplemental tutoring available under Texas law HB4545. R. 693-704. The committee did not reach an agreement on hours and subject for tutoring under HB4545. R. 701. W.H.'s guardian supplemented the ARD notes with his own version of events. R. 705.

Overall, in eighth grade, W.H. averaged above 90 in all classes and only had two term grades below a 90: one in Math and one in Science. R. 795. On the Renaissance 360 Reading Test, W.H. scored at the 3rd percentile nationally at the beginning of eighth grade and at the 5th percentile

nationally in the middle of the year. R. 1488. The record does not include results from an end-of-year Renaissance 360 Reading Test. *Id.* W.H.'s instructional reading level was 4.1. *Id.* On the Renaissance 360 Math Test, W.H. scored at the 6th percentile nationally at the beginning of the year, at the 1st percentile nationally in the middle of the year, and at the 3rd percentile nationally at the end of the year. *Id.* The record does not include STAAR results from eighth grade.

### d. Ninth Grade

The present dispute began when the ARD committee convened to develop W.H.'s IEP for the upcoming 2023-2024 school year. R. 708-759. W.H. was preparing to transition from middle to high school and begin ninth grade.

At the March 2023 ARD committee meeting, W.H.'s PLAAFP showed that he could read at a seventh grade Independent Reading Level, but his comprehension level did not match his fluency level. R. 714. Math was noted "as an area of academic struggle" for W.H. *Id.* At the beginning of the year, his Renaissance 360 Math test results placed him in the 6th percentile, but in the middle of the year, he fell to the 1st percentile. *Id.* On several mathematical topics, W.H. performed at the second-grade level. *Id.* His math teacher reported that W.H. required "direct support to complete independent tasks in math." R. 715. The ARD committee agreed to the PLAAFP before tabling the meeting until April 17, 2023. R. 729-730.

On April 17, 2023, the ARD committee reconvened. R. 730-731. For the upcoming school year, FBISD proposed that W.H. be placed in the resource setting for Math and English, continue in the resource setting for Basic Reading (to address dyslexia), and remain in the general education setting with in-class support for Social Studies and Science. *Id.* W.H.'s guardian agreed with continuing in-class support for Social Studies and Science. He did not agree with the proposed Resource instruction for W.H. in Math and English and was uncertain about continued dyslexia

services in the resource setting. *Id.* W.H.'s guardian and his guardian's advocate complained that FBISD was not collaborative, was making errors with accommodation logs and grades, was not providing support to W.H. or his guardian, and was improperly implementing W.H.'s IEP. *Id.* W.H.'s guardian also said that he felt targeted and thought FBISD's proposal was retaliatory. *Id.* FBISD responded that the proposal was based on "multiple data points such as work samples, IEP and accommodation log data, FIE, IEE, and on teacher input on daily level of supports" for W.H. *Id.* W.H.'s guardian stated that W.H.'s excellent grades were proof that supports were working and that W.H. was successful in general education setting. *Id.* FBISD responded that W.H. "does achieve those grades because of the high level of support he receives daily from his teachers. If he was to work independently without the support of staff, he would not be able to complete the tasks and make the same grades." *Id.* The ARD meeting was continued without any resolution.

On May 10, 2023, the ARD committee reconvened. R. 732-733. W.H.'s guardian began by stating he felt "blindsided" by FBISD's proposal because W.H.'s accommodation logs from sixth and seventh grade did not indicate that resource setting was necessary. *Id.* FBISD staff responded that W.H.'s grades were based on extensive supports and assistance and that "when that adult support is not provided, [W.H.] does not complete the work independently." *Id.* W.H.'s guardian reiterated his belief that he and W.H. were "being targeted and retaliated against." *Id.* FBISD responded that the proposal was based on data supporting the need for a resource setting, not on retaliation or discriminatory motives. *Id.* Although the ARD committee concluded without agreement on resource setting for Math and English, the committee did agree to add modified curriculum meaning modified Texas Essential Knowledge and Skills (TEKS) expectations as an accommodation for all W.H.'s core content classes. *Id.*

Right before W.H. began ninth grade in the 2023-2024 school year, W.H.'s ARD committee met to continue discussions of W.H.'s educational placement and FBISD's proposal that he receive resource instruction in Math and English. R. 760-776. On August 7, 2023, W.H.'s guardian said he still did not agree with placing W.H. in the resource setting for Applied English, Applied Math, and Applied Reading. R. 774. FBISD staff reiterated their position that the data supported placing W.H. in resource rather than continuing in-class support. *Id.* According to W.H.'s IEP, he was "making progress" but (1) could not "achieve the goals and objectives contained in the IEP even though supplementary aids and services are used" and (2) "needed modifications [that could not] be implemented without eliminating essential components from curriculum/activity(ies)." R. 770. In addition to the resource setting, FBISD continued to propose numerous accommodations for W.H., but it reduced the quantity of accommodations for Math and English since those subjects would be provided in the more intensive resource setting. R. 766-767.

On August 11, 2023, W.H.'s guardian requested an administrative due process hearing in accordance with the IDEA. The request initiated a "stay put" placement and paused FBISD's proposed placement of W.H. in the resource setting for Applied English and Applied Math. Among other things, W.H. sought "An order to compel FBSD to continue to provide English/Language Arts and Mathematics instruction in the General Education classroom." R. 32. According to the Hearing Officer's decision, the ARD committee reconvened on October 3, 2023 to reinstate the prior IEP for W.H (R. 33 ¶ 33), but the record contains a copy of the IEP notes from October 3, 2022 rather than the cited notes for October 3, 2023. *See* R. 669-681, 777-789. Regardless, the parties agree that W.H. remained in the general education setting with in-class special education support for the 2023-2024 school year. During his first term of ninth grade, W.H. received all A's. R. 796.

11

In the 2023-2024 school year, W.H. received the following accommodations in English: (1) supplemental aids for assignments, tests, and projects; (2) accommodation implementation; (3) assistive technology; (4) check for understanding with specific feedback from student; (5) directions given in a variety of ways/simplified; (6) extra time; (7) frequent positive feedback; (8) no penalty for spelling errors; (9) opportunity to retake tests/assignments below 75; (10) oral administration of tests; (11) oral responses on open-ended tests; (12) provide copy of teacher notes; (13) reading (decoding) assistance; (14) reminders to stay on task; (15) repeated review; (16) simplified/new vocabulary prior to lesson taught; (17) small group administration of tests; (18) study guide provided prior to test; and (19) test administered on paper. R. 719-720.

In the same year, W.H. received the following accommodations in Math: (1) supplemental aids for assignments, tests, and projects; (2) accommodation implementation; (3) assistive technology; (4) calculation aids; (5) check for understanding with specific feedback from student; (6) directions given in a variety of ways/simplified; (7) extra time; (8) frequent positive feedback; (9) seven-step math instructional plan; (10) no penalty for spelling errors; (11) opportunity to retake tests/assignments below 75; (12) oral administration of tests; (13) oral responses on open-ended tests; (14) provide copy of teacher notes; (15) reading (decoding) assistance; (16) reduced complexity of problems for math; (17) reminders to stay on task; (18) repeated review; (19) simplified directions in math; (20) simplified/new vocabulary prior to lesson taught; (21) small group administration of tests; (22) study guide provided prior to test; (23) test administered on paper; and (24) visual prompts until new information is mastered. *Id.*

### e. Due Process Hearing

W.H.'s due process hearing was held on January 24-26, 2024 before a Special Education Hearing Officer for the State of Texas. R. 1. On January 24, 2024, three witnesses testified: Jason

Karam, W.H.'s ninth grade Algebra I teacher; Jesse Sowells, W.H.'s inclusion support teacher for World Geography; and Dominique Barker, W.H.'s inclusion support teacher for middle school English. On January 25, 2024, Dominique Barker continued her testimony, and Jennifer Byrne, Assistant Director for Special Education for FBISD, testified. On January 26, 2024, Jennifer Byrne continued her testimony, and two new witnesses testified: Sean Stacy, W.H.'s inclusion support teacher for Algebra I, and Deena Hill, FBISD's Executive Director for Student Support Services.

First, Jason Karam testified that, although he gave W.H. a 94 in the first term of Algebra I, he had not "seen much progress this school year" from W.H. R. 5169. W.H. was "on track" to master his Algebra I IEP goal by the next annual review, but his accommodations, including access to teacher's notes and answer keys, meant that Mr. Karam could not evaluate his understanding of the material. R. 5171-5174. In Algebra I, W.H. worked on "unmodified" classroom assignments, meaning general education questions with access to teacher's notes and answer keys, "modified" homework assignments, and "modified" tests with fewer questions, simplified directions, simplified vocabulary, and access to notes and answer keys for previous assignments. R. 5192-97; 5227-5228. Mr. Karam concluded that W.H. could be successful in terms of getting good grades but he would "probably not fully understand the material and be successful in any future math courses" because his accommodations "pave over the thought process of him using his brain to recall information." R. 5224. He did not believe that W.H. could be successful in a general education classroom because he needed "more one-on-one time, a slower pace of the lesson and more of a smaller class size." R. 5233-34. Mr. Karam noted that W.H. usually did not speak to his classmates in Algebra I. R. 5229, 5234.

Mr. Karam also testified that W.H. had questions or needed assistance 80-85% of the time but did not advocate for himself or seek help until he was asked directly if he needed assistance.

R. 5229-5230, 5258. Sean Stacy, an FBISD inclusion teacher, was assigned to work with eleven special education students in the Algebra I class, but according to Mr. Karam, he spent 70-75% of his time with W.H. R. 5230-5231. Mr. Karam reported that he told FBISD administrators it was difficult to accommodate the other special education students because of the amount of attention and support that W.H. required. R. 5244.

Next, Jesse Sowells, W.H.'s case manager and inclusion teacher for World Geography, testified about W.H.'s IEP progress reports. According to W.H.'s English teacher, he was making progress and the current goals and plan of service "continue to be appropriate" for him. R. 5267-5275. Similarly, W.H.'s IEP progress report suggested that his current goal and plan of service in Math continued to be appropriate, but Mr. Sowells noted that Mr. Karam had told him it was difficult to assess W.H.'s progress due to his accommodations. R. 5275-5278. Mr. Sowells concluded that, while W.H. was making progress in general education, he would perform better in the resource setting because he could "grow at his pace" and progress at his own level. R. 5283, 5285-86. Mr. Sowells also believed that W.H. would feel less shame about completing lower-level work if he was in the resource setting rather than the general education classroom. R. 5286-94.

Third, Dominique Barker, W.H.'s inclusion teacher for ELA in middle school, testified about his progress in the subject. R. 5310.  He stated that W.H. "made some progress" in English in seventh and eighth grade. R. 5318-19. However, Mr. Barker believed that W.H. "required a resource setting" for English in ninth grade based on the amount of "one-on-one with [W.H], small group setting, incomplete assignments, and just some modeling" that he had to do to assist W.H. with every assignment. R. 5351. He testified that he spent 80-85% of class time working with W.H., so he was unable to meet the needs of the other four to five special education students in the class. R. 5406-5408.

Jennifer Byrne, FBISD's Assistant Director for Special Education, testified that FBISD and the ARD committee had discussed placing W.H. in the resource setting for Math and English repeatedly before 2023. R. 5541-42. Ms. Byrne further explained that several of W.H.'s accommodations amounted to modifications of the curriculum. R. 5592-94. She agreed that W.H.'s accommodations amounted to "resource instruction in the general education classroom" or a "class within a class." R. 5574-75; R. 5707-08. She also testified at length about the results of W.H.'s cognitive assessments over the years and his regression in standardized test scores. R. 5646-84.

Ms. Byrne concluded that W.H. should receive resource instruction in Math and English because his "rate of progress where he is in relation to what is expected at grade level, his current ability to function independently and use the information and keep up with the pace that is required within the general education curriculum, that is not something that [W.H] is doing and hasn't been doing for quite some time." R. 5686. Instead, W.H. had "become even more dependent, prompt dependent to function in class." R. 5687. She felt that a resource placement with different pace and rigor of instruction would help him build his confidence, improve his self-advocacy skills, and learn to work through academic tasks independently. R. 5688-91, 5827 ("The resource classroom for [W.H.] would be there to really help him work on those foundational skills at a pace that is conducive for him to really understand those skills and be able to build upon them so that when he is out in the general education class he is likely more apt to be able to perform those skills on a more independent level."). Ms. Byrne also noted that, of the 11,000 special education students in FBISD, no student received as much one-on-one special education support in general education classes as W.H. R. 5578, 5837. She agreed that W.H. was receiving "extensively modified instruction within the general education classroom." R. 5840.

The next witness, Sean Stacy was W.H.'s in-class support teacher for Algebra I. R. 5870. Mr. Stacy testified that he was assigned to ten or eleven special education students in W.H.'s class but spent the "very large majority" of his time working with W.H. R. 5873-74. W.H.'s assignments were different from those of other students; for example, instructions were simplified, multi-step problems were broken down into individual steps, and formulas were provided for him. R. 5876; 5881. According to Mr. Stacy, these differences meant that, in practice, the state-level expectations were altered for W.H. because he did not have to independently think through the problems. R. 5891. Mr. Stacy testified that W.H.'s grade was not an accurate reflection of his knowledge of the subject because he was "nowhere near" understanding and applying the step-by-step process of solving a math problem independently. R. 5899-90. He also said that W.H. had not progressed in Algebra I but rather required "more and more help." R. 5900. He noted that W.H.'s recent Renaissance 360 Math test placed him at a second-grade level. R. 5901. Ultimately, Mr. Stacy concluded that W.H. could not progress in the general education environment and would benefit from the smaller resource setting. R. 5901-02.

Finally, Deena Hill, FBISD's Executive Director for Student Support Services, testified that she too spent a disproportionate amount of time on W.H.'s case. R. 5943. She estimated that W.H. could occupy 10% of her work week even though she was responsible for 11,000 students in FBISD. *Id.* She also agreed with FBISD's proposal to place W.H. in the resource setting for Math and English. R. 5957.

On March 19, 2024, the Hearing Officer issued his decision. R. 1-22. After taking testimony and evidence, the Hearing Officer determined that, before the 2023-2024 school year, FBISD provided W.H. with an IDEA-compliant free appropriate public education (FAPE). R. 20. However, he found that the proposed IEP for the 2023-2024 school year did not comply with the

requirement to educate W.H. in the least restrictive environment to the extent it required his placement in a resource setting for *both* Math and English. *Id.* Instead, the Hearing Officer determined that the evidence supported a resource placement for Math and a general education placement with special education supports for English. *Id.*

### f. Procedural History

On April 24, 2024, Plaintiff W.H. filed suit against Defendant FBISD in this Court, asserting claims under the Individuals with Disabilities Education Act (IDEA) and Section 504 of the Rehabilitation Act. ECF No. 1. On April 28, 2025, parties filed cross-motions for Judgment on the Record. ECF Nos. 18, 19.

FBISD requested that the Court uphold the Hearing Officer's decision in part, as it relates to W.H.'s placement for Math in the resource setting, and reverse in part, as it relates to W.H.'s placement for English in the general education setting. ECF No. 18. FBISD also moved for summary judgment on W.H.'s claim under Section 504 of the Rehabilitation Act. *Id.* W.H. moved for the reverse holding; he asked the Court to uphold the Hearing Officer's decision in part, as it relates to his placement for English in the general education setting, and to reverse in part, as it relates to his placement for Math in the resource setting. ECF No. 19.

On June 12, 2025, the Court held a hearing on the pending Motions for Judgment on the Record. After hearing arguments from counsel, the Court took the motions under advisement. On June 17, 2025, the Court requested supplemental briefing on the issue of how the Supreme Court's recent decision in *A. J. T. v. Osseo Area Schools, Independent School District No. 279* (2025) impacted FBISD's motion for summary judgment on W.H.'s Section 504 claim. The parties submitted supplemental briefing on June 27, 2025. ECF Nos. 30, 31.

## II.    INDIVIDUALS WITH DISABILITIES EDUCATION ACT (IDEA)

"Congress enacted the IDEA to ensure that children with disabilities will have access to public education, including special education and related services." *R.H. v. Plano Indep. Sch. Dist.*, 607 F.3d 1003, 1008 (5th Cir. 2010); *Daniel R.R. v. State Bd. of Educ.*, 874 F.2d 1036, 1044 (5th Cir. 1989)). The IDEA "offers States federal funds to assist in educating children with disabilities." *Endrew F. ex rel. Joseph F. v. Douglas Cty. Sch. Dist. RE-1*, 580 U.S. 386, 390 (2017). When a State accepts funds, it "pledges to comply with a number of statutory conditions," among them providing "a free appropriate public education—a FAPE, for short—to all eligible children." *Id.* (citing 20 U.S.C. § 1412(a)(1)). States "covered by the IDEA must provide a disabled child with such special education and related services 'in conformity with the [child's] individualized education program,' or IEP." *Id.* at 390-91 (citing 20 U.S.C. § 1401(9)(D)).

"The IEP is 'the centerpiece of the statute's education delivery system for disabled children.'" *Id.* at 391 (quoting *Honig v. Doe,* 484 U.S. 305, 311 (1988)). "A comprehensive plan prepared by a child's 'IEP Team' (which includes teachers, school officials, and the child's parents), an IEP must be drafted in compliance with a detailed set of procedures." *Id.* (citing § 1414(d)(1)(B)). Through the IEP, "special education and related services are 'tailored to the unique needs' of a particular child." *Id.* (quoting *Board of Ed. of Hendrick Hudson Central School Dist., Westchester Cty. v. Rowley,* 458 U.S. 176, 181 (1982)). IDEA further requires that states "mainstream disabled children, i.e., that they will educate them with children who are not disabled, and that they will segregate or otherwise remove such children from the regular classroom setting only when the nature or severity of the handicap is such that education in regular classes cannot be achieved satisfactorily." *Honig*, 484 U.S. at 311 (cleaned up).

When parents and educators disagree about a child's IEP, "parents may turn to dispute resolution procedures established by the IDEA." *Endrew F.*, 580 U.S. at 390 (citing 20 U.S.C. §§ 1415(e), (f)(1)(B)(i)). If preliminary resolution efforts fail to resolve the disagreement, the parties may proceed to a "'due process hearing' before a state or local education agency." *Id.* at 391-92 (citing 20 U.S.C. §§ 1415(f)(1)(A), (g)). "And at the conclusion of the administrative process, the losing party may seek redress in state or federal court." *Id.* at 391 (citing 20 U.S.C. § 1415(i)(2)(A)).

For an appeal of a due process hearing, the IDEA directs that the Court "(i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party; and (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(C). The Court "is required to accord due weight to the hearing officer's findings, but it must ultimately reach an independent decision based on the preponderance of the evidence." *Seth B. ex rel. Donald B. v. Orleans Par. Sch. Bd.*, 810 F.3d 961, 966 (5th Cir. 2016) (cleaned up). In other words, the Court's "review of a hearing officer's decision is virtually de novo." *Id.* Courts review the administrative record and any additional evidence to determine whether "there has been compliance with IDEA's processes and that the child's educational needs have been appropriately addressed." *Id.*

The direction to the Court to base "its decision on the 'preponderance of the evidence' is by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review." *Rowley*, 458 U.S. at 206. Instead, the Court's only statutory authority is to determine whether (1) the State has complied with the procedural requirements of the IDEA and (2) the IEP developed through the IDEA's procedures is reasonably calculated to enable the child to receive educational benefit. *Id.* at 206-07. The Court

19

is directed to evaluate "whether the IEP is *reasonable*, not whether the court regards it as ideal." *Endrew F.*, 580 U.S. at 400 (emphasis in original). The free appropriate public education proffered in an IEP "need not be the best possible one, nor one that will maximize the child's educational potential; rather, it need only be an education that is specifically designed to meet the child's unique needs, supported by services that will permit him 'to benefit' from the instruction." *Cypress-Fairbanks Indep. Sch. Dist. v. Michael F. by Barry F.*, 118 F.3d 245, 247-48 (5th Cir. 1997) (quoting *Rowley*, 458 U.S. at 188-89).

Although *Rowley* "expressly declined 'to establish any one test for determining the adequacy of educational benefits' under the Act," it established a general approach: "To meet its substantive obligation under the IDEA, a school must offer an IEP reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Endrew F.*, 580 U.S. at 399 (quoting *Rowley*, 458 U.S. at 202). To determine "whether an IEP is reasonably calculated to provide a meaningful educational benefit under the IDEA," and thus satisfies the Act's requirements, *Michael F.* directs courts to consider the following four factors:

> (1) the program is individualized on the basis of the student's assessment and performance; (2) the program is administered in the least restrictive environment; (3) the services are provided in a coordinated and collaborative manner by the key "stakeholders"; and (4) positive academic and non-academic benefits are demonstrated.

*Michael F.*, 118 F.3d at 253. Courts are not required to consider or weigh these factors in any specific way. *Klein Indep. Sch. Dist. v. Hovem*, 690 F.3d 390, 396 (5th Cir. 2012). Since the *Michael F.* factors are "intended to guide a district court in the fact-intensive inquiry of evaluating whether an IEP provided an educational benefit," courts do "not legally err by affording more or less weight to particular *Michael F.* factors." *Richardson Indep. Sch. Dist. v. Michael Z*, 580 F.3d 286, 294 (5th Cir. 2009).

In addition to the *Michael F.* factors, the Fifth Circuit has established a "flexible, two-part test" for evaluating whether IDEA's mainstreaming requirement has been met and whether a child is being educated in the least restrictive environment:

> First, [courts] ask whether education in the regular classroom, with the use of supplemental aids and services, can be achieved satisfactorily for a given child. If it cannot and the school intends to provide special education or to remove the child from regular education, [courts] ask, second, whether the school has mainstreamed the child to the maximum extent appropriate.

*Daniel R.R.*, 874 F.2d at 1048. "[N]o single factor is dispositive in all cases." *Id.* Instead, courts must conduct "an individualized, fact-specific inquiry that requires" careful examination of "the nature and severity of the child's handicapping condition, his [or her] needs and abilities, and the schools' response to the child's needs." *Id.* The Fifth Circuit has established that "*Michael F.* and *Daniel R.R.* are not in conflict," but rather, the "analysis of the second *Michael F.* factor . . . is guided by *Daniel R.R.*" *R.H.*, 607 F.3d at 1013.

Finally, courts must be cautious, when reviewing IDEA claims, "to avoid imposing their view of preferable educational methods upon the States." *Rowley*, 458 U.S. at 207. The IDEA left "primary responsibility" for formulating the educational program "and for choosing the educational method most suitable to the child's needs . . . to state and local educational agencies in cooperation with the parents or guardian of the child." *Id.* Therefore, the Court's "task is not to second guess state and local policy decisions; rather it is the narrow one of determining whether state and local school officials have complied with the Act.'" *White ex rel. White v. Ascension Par. Sch. Bd.*, 343 F.3d 373, 377 (5th Cir. 2003). And "the IDEA creates a presumption in favor of a school system's educational plan, placing the burden of proof on the party challenging it." *Id.* Thus, in the Fifth Circuit, the "party attacking the appropriateness of an IEP established by a local

educational agency bears the burden of showing why the IEP and the resulting placement were inappropriate under the IDEA." *Michael F.*, 118 F.3d at 252.

Here, W.H. challenges the Hearing Officer's decision to uphold his placement in the resource setting for Math, and W.H. supports the Hearing Officer's decision to overturn his placement in the resource setting for English. On the other hand, Defendant FBISD supports the Hearing Officer's decision to uphold W.H.'s placement in the resource setting for Math and challenges the Hearing Officer's decision to overturn his placement in the resource setting for English. W.H. seeks a court ruling that he should be educated in the general education classroom for both Math and English while FBISD seeks a court ruling that W.H. should be educated in the resource classroom for both Math and English.

The Court's task is to conduct a de novo review of the record while giving due weight to the Hearing Officer's findings. Therefore, the Court examines the administrative record to determine whether the proposed resource placement in Math and English is reasonably calculated to provide a meaningful educational benefit, and thus appropriate under the four *Michael F.* factors. Because the second factor requires a more detailed discussion and analysis of the *Daniel R.R.* factors, the Court first addresses the other three factors. The Court must also evaluate whether the IEP makes an appropriate placement for Math and English separately.

### a.  Factor 1: Whether the program is individualized on the basis of the Plaintiff's assessment and performance

The first factor as to whether an IEP is reasonably calculated to provide a meaningful education benefit is whether the IEP was "individualized on the basis of the Plaintiff's assessment and performance." *Klein*, 690 F.3d at 396 (quoting *Michael F.*, 118 F.3d at 253). "An IEP is sufficiently individualized if it is 'designed for [the child's] unique needs.'" *D.C. v. Klein Indep. Sch. Dist.*, 860 Fed. Appx. 894, 903 (5th Cir. 2021) (quoting *E. R. by E. R. v. Spring Branch Indep.*

*Sch. Dist.*, 909 F.3d 754, 768 (5th Cir. 2018)). The record reflects that W.H.'s IEP was based on multiple evaluations (both FIEs and IIEs), teacher and staff input, grades, and standardized test scores. W.H.'s evaluations included the March 2019 IEE, the December 2019 FIE, the September 2021 FIE, and the July 2022 IEE, and each evaluation assessed W.H.'s individual abilities and needs. R. 212-229, 233-288, 295-358, 359-411. In addition to the evaluations, W.H.'s guardian and teachers provided input on the appropriate educational program. The extensive record in this case demonstrates that the parties held numerous ARD committee meetings to review and revise W.H.'s IEP over the years.

However, W.H. argues that FBISD failed to individualize his 2023-2024 IEP when it recommended a resource placement for Math and English. Specifically, W.H. argues that, in March 2022, the ARD committee recommended that he remain in the general education classroom with in-class support for eight grade, but in September 2022, FBISD began to suggest resource placement for Math and English, "despite Plaintiff's good grades and progress on his IEP goals." ECF No. 19 at 10-11. W.H. argues that the change in placement was not justified based on any new assessments or his performance in those courses. *Id.*

First, the Court finds that, although the ARD committee recommended W.H. continued placement in the general education classroom for eighth grade, the committee did discuss the possibility of altering W.H.'s assigned placement. According to the deliberations, on March 31, 2022, W.H.'s guardian advocate expressed concern that the current data did "not indicate[] [W.H.] is making progress in the current setting and stated the ARD committee should consider a more supported setting." R. 589. She later expressed that "when looking at his writing samples [W.H] is showing to be multiple grade levels below, and that is the reason the instructional setting should be adjusted." *Id.* When the committee reconvened on May 3, 2022, W.H.'s guardian advocate

asked if W.H. was getting a meaningful benefit from the general education English class, and Mr. Barker "explained that [W.H.] may benefit from a smaller setting." R. 594. During both meetings, the discussion was then redirected to reviewing W.H.'s PLAAFP because the committee had to approve it before determining the appropriate setting for services. Ultimately, the ARD committee added new accommodations and determined that the general education classroom placement with in-class special education support was the least restrictive environment for W.H. R. 599. However, the Court considers it relevant that the committee was discussing the possibility of altering W.H.'s placement before September 2022.

Second, the Court finds that FBISD's proposed change in placement from spring to fall 2022 was based on W.H.'s assessment and performance. W.H. argues that the intervening July 2022 IEE results could not justify the change in placement because Dr. Kelly said W.H. "would likely perform well in a general education class setting with in-class support and supplemental interventions and reteaching as needed." R. 408. However, Dr. Kelly also stated,

> [W.H] will likely perform best in a class with clear and precise rules and expectations. It is clear that [W.H.] performs better when there is high structure and teacher supervision to make sure that he executes what is expected. When he is in an unstructured environment or when he is not frequently monitored, he is likely to be off task. [W.H.] is in need of greater assistance with his independent assignments. He needs a teacher who will be interactive with him, frequently checking in with him and monitoring his understanding and performance. He also performs better when provided with in-class support, where he can receive greater attention.

*Id.* While the July 2022 IEE did not advocate for resource placement, it did highlight the robust in-class support W.H. needed to progress in a general education classroom. The assessment results could support a placement change if FBISD found that W.H. needed more support than could be provided in the general education setting or that he was not making progress even with considerable support. FBISD also notes that W.H.'s 2019 IEE recommended that "the school consider increasing the amount of special education support provided to [W.H.]" including by

24

"providing instruction for these key academic areas in a resource setting and provided by a special education teacher." R. 221. Although FBISD did not make a resource placement in 2019, the record reflects that the ARD committee considered a resource setting before making the proposal in September 2022, so the deliberations were based on W.H.'s assessment, even if it was not the most recent assessment.

Further, W.H. argues that his performance did not justify a change in placement because his "assessments showed what they had shown for years—that [W.H] is behind his typically developing peers." ECF No. 19 at 12. However, W.H.'s academic performance also showed patterns of regression and lack of progress on standardized tests, even as he achieved IEP goals and excellent grades. Although W.H. contests the weight that should be given to each of these measures, the record reflects that FBISD considered all metrics of W.H.'s performance before proposing resource instruction. FBISD does not point to any single data point in 2022 that initiated the shift in placement, but it does highlight that the placement decision was "the result of multi-year data trends, expert evaluations, and careful analysis of W.H.'s actual academic performance." ECF No. 20 at 7.

Therefore, the Court holds that the preponderance of the evidence shows that the IEP was developed based on W.H.'s assessments and performance and to serve his individualized needs.

### b. Factor 3: Whether the services are provided in a coordinated and collaborative manner by the key "stakeholders"

The third *Michael F.* factor requires assessing whether special education services have been provided in a coordinated and collaborative manner. Here, the record shows that FBISD convened properly composed ARD committee meetings that included W.H.'s guardian, special and regular education teachers, FBISD special education staff, special education advocates for W.H., and other participants. Over the years, several ARD meetings, including annual IEP reviews, took place over

numerous sessions to ensure that all data was reviewed, and all concerns were heard and addressed. At the meetings, the committee created detailed goals and adopted numerous and evolving accommodations to help W.H. progress in his education. Although W.H.'s guardian disagreed with many of FBISD's IEP decisions, including the proposal to place W.H. in a resource classroom for both Math and English, the right of a guardian to meaningful input in the IEP process does not amount to "veto power" over decisions. *White*, 343 F.3d at 380. The Fifth Circuit explicitly rejected "the assertion that parents are denied input into a decision if their position is not adopted." *Id.* at 377. "Absent any evidence of bad faith exclusion of [W.H.'s guardian] or refusal to listen to or consider [his] input," FBISD met the IDEA's procedural requirements. *Id.* at 380.

W.H. contends that FBISD did not properly collaborate with his guardian because FBISD (1) provided him with unreliable documentation and (2) spent time in ARD meetings trying to improve "parental relations" rather than fulfilling its statutory role. ECF No. 19 at 27. W.H. characterizes FBISD's behavior as an abdication of its role to develop an IEP reasonably calculated to provide him a meaningful educational benefit. *Id.* at 27-28.

The Court finds that the preponderance of the evidence shows that FBISD did engage in a coordinated and collaborative manner to pursue W.H.'s best interests. W.H. points to two decisions by the Texas Education Agency (TEA) sustaining his guardian's allegations concerning FBISD's lack of compliance with his IEP (R. 1039-49), but FBISD points to several other TEA decisions finding that his guardian's allegations of lack of compliance were unsubstantiated. R. 1184-1191, 1192-1196, 1197-1203. The two incidents W.H. cites do not undermine the finding of coordination and collaboration in light of the extensive record evidence of consistent communication with W.H.'s guardian about his IEP. W.H. also argues that FBISD disclaimed the accuracy of the record evidence, including grades, IEP progress reports, ARD committee deliberation, ARD documents,

and accommodation logs, so communication with his guardian was based on false information and cannot be considered collaborative. ECF No. 19 at 27. However, FBISD's acknowledgment of mistakes in some documents and the need to contextualize others does not demonstrate that FBISD was communicating false information and failing to collaborate. Instead, the record shows that FBISD consistently did its best to communicate with W.H.'s guardian to ensure that it provided IEP services properly.

Further, W.H. argues that FBISD based accommodations on its desire to improve "parental relations" rather than a desire to help W.H. achieve meaningful academic benefit. However, the cited evidence reflects only that FBISD adopted accommodations or granted information requests made by W.H.'s guardian. R. 5631-32 (providing study guides two days before tests), 5636-38 (sending weekly accommodation logs), 5775-82 (sending scratch paper and accommodation logs); 5802-03 (removing discretion for IEP implementation). When Ms. Byrne was asked if these accommodations and requests were granted "to maintain positive parent relations" with W.H.'s guardian, she explained that they were examples of "the ARD committee's listening to the parent's concern and request, considering the information that was presented in that conversation and ultimately determining that that is an appropriate piece to add in through collaboration." R. 5781-82. The fact that some witnesses disagreed with the necessity of these accommodations at the time they were adopted or after experience with their implementation does not prove that the ARD committee did not base them on W.H.'s best interest.

The record suggests that FBISD has an intense and, at times, contentious relationship with W.H.'s guardian, but even so, FBISD made decisions with W.H.'s education as its priority. After all, the record contains instances where the school-based committee members disagreed with W.H.'s guardian, including about the July 2022 IEE's conclusion that W.H. met criteria for autism

and speech impairment, or asked for additional time to consider one of his proposals or make a counterproposal. R. 659-660, 514-15. Also, FBISD's proposal to place W.H. in resource classroom was certainly not an attempt to placate his guardian.

Therefore, W.H. has presented little evidence that the ARD abdicated its role to him, and the preponderance of evidence shows that FBISD instead provided special education services in a coordinated and collaborative manner to help W.H. achieve meaningful educational benefit.

### c. Factor 4: Whether positive academic and non-academic benefits are demonstrated

The Fifth Circuit has noted that the fourth *Michael F.* factor – whether the student received academic and nonacademic benefits – can be one of the most critical in the overall analysis. *R.P. ex rel. R.P. v. Alamo Heights Indep. Sch. Dist.*, 703 F.3d 801, 813-814 (5th Cir. 2012). However, the Fifth Circuit has also explained that it is not necessary for a student to improve in every area of his IEP to obtain an academic benefit that satisfies the IDEA. *Bobby R.*, 200 F.3d at 350.

The record reflects that W.H. did receive *some* positive academic and non-academic benefits from his placement in the general education classroom. W.H. himself points to his progress on IEP goals and excellent grades, and FBISD agrees that W.H.'s prior IEPs provided him with academic and non-academic benefits. Although W.H. argues that FBISD failed to provide benefits appropriate to his unique characteristics because it focused on parental relations and failed to modify the curriculum appropriately, the Court has already determined that FBISD's priority when developing IEPs was W.H.'s education, not placating his guardian. Further, the FAPE "proffered in an IEP 'need not be the best possible one, nor one that will maximize the child's educational potential; rather, it need only be an education that is specifically designed to meet the child's unique needs, supported by services that will permit him "to benefit" from the instruction.'" *Adam J.*, 328 F.3d at 808. W.H. may believe that appropriate modifications would

28

have better addressed his unique characteristics, circumstances, and needs and led to greater positive academic and non-academic benefits, but that is not the metric.

Since W.H. has not been placed in the resource classroom for Math or English due to the "stay put," the Court cannot evaluate whether the proposed IEP has provided any academic or non-academic benefits to W.H. Yet, there is evidence that the proposed resource placement would provide academic benefits, by allowing W.H. to learn at a more suitable pace, and non-academic benefits, by alleviating his anxiety and shame about working on lower-level material than other students in the general education classroom.

In sum, the Court finds that the preponderance of evidence shows that W.H. did receive both academic and non-academic benefits from the general education classroom. The extent and meaningfulness of the academic and non-academic benefit that W.H. is now receiving from being in the general education classroom is disputed and goes to the least restrictive environment analysis. *H.W. by and through Jennie W v. Comal Indep. Sch. Dist.*, 32 F.4th 454, 465-66 (5th Cir. 2022).

### d. Factor 2: Whether the program is administered in the least restrictive environment

The Court now turns to the second *Michael F.* factor which is the core issue in this appeal: whether the proposed IEP for the 2023-2024 school year provides W.H. education in the least restrictive environment. Specifically, the issue is whether the resource setting for Math and English is the least restrictive environment for W.H.

Under the IDEA, students are to be educated in the least restrictive environment "[t]o the maximum extent appropriate," meaning that students with disabilities are to be educated with students who are not disabled, with the school district ensuring that students are removed "from the regular educational environment . . . only when the nature or severity of the disability . . . is

such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily." *Daniel R.R.*, 874 F.2d at 1050. The Fifth Circuit has explained that the IDEA's "mandate for a free appropriate public education qualifies and limits its mandate for education in the regular classroom." *Id.* at 1045. In other words, "when education in a regular classroom cannot meet the [disabled] child's unique needs, the presumption in favor of mainstreaming is overcome and the school need not place the child in regular education." *Id.*

To determine whether FBISD has complied with the mainstreaming requirement, the Court applies the flexible, two-part test the Fifth Circuit announced in *Daniel R.R.*

### i. Whether education in the regular classroom, with the use of supplemental aids and services can be achieved satisfactorily

The Court's first inquiry is "whether education in the regular classroom, with the use of supplemental aids and services, can be achieved satisfactorily for a given child." *Daniel R.R.*, 874 F.2d at 1048. The Court must begin its analysis by examining whether FBISD has taken steps to accommodate W.H. in general education. *Id.* "If the state has made no effort to take such accommodating steps, our inquiry ends, for the state is in violation of the Act's express mandate to supplement and modify regular education. If the state is providing supplementary aids and services and is modifying its regular education program, we must examine whether its efforts are sufficient." *Id.* Here, it is beyond dispute that FBISD has taken steps to accommodate W.H. in general education.

The Court therefore turns to the issue of whether FBISD's accommodation efforts are sufficient. "The Act does not permit states to make mere token gestures to accommodate" disabled students but rather imposes a "broad," though "not limitless" requirement to modify and supplement general education. *Id.* Pertinent considerations for evaluating the sufficiency of accommodation efforts include: (1) "whether the child will receive an educational benefit from

30

regular education," (2) "the child's overall educational experience in the mainstreamed environment, balancing the benefits of regular and special education for each individual child," and (3) "what effect the [disabled] child's presence has on the regular classroom environment and, thus, on the education that the other students are receiving." *Id.* at 1048-49. However, the Fifth Circuit explained that these three factors are not exhaustive, no single factor is dispositive in all cases, and the Court must engage in an "individualized, fact-specific inquiry that requires us to examine carefully the nature and severity of the child's [disabilities], his needs and abilities, and the schools' response to the child's needs." *Id.* at 1048.

## 1. Educational Benefit

The first factor evaluates W.H.'s ability to grasp the essential benefits of the regular education curriculum. There is no significant dispute that W.H. made some progress when placement in the general education setting with in-class support for Math and English. Thus, he was receiving an educational benefit in that setting to some extent, but the Court must delve deeper and evaluate whether he was making progress appropriate in light of his circumstances. *Endrew F.*, 580 U.S. at 399.

In Math, W.H. has consistently received good grades each term in middle and high school: mostly A's with some B's. R. 794-96. There is also evidence that he made some progress on his IEP goals as his IEP said he was on track to master his Algebra 1 goal by the next annual review and that the current plan continued to be appropriate. R. 853. Yet, even with his extensive supports, W.H. does not appear to be making the expected progress in understanding the material. Years of Renaissance 360 and STAAR scores showed that he was performing well below grade level and was in need of "urgent intervention." R. 791-92, 1204-1205, 1488-1489, 1813-1814. W.H. argues that standardized test scores evaluate whether he is making progress relative to his peers rather

than progress appropriate in light of his circumstances. However, the Fifth Circuit has explained that courts must evaluate the "overall academic record" and "that while test scores and the like are not dispositive, they are important metrics." *H.W.*, 32 F. 4th at 569. Here, W.H.'s Renaissance 360 results show that he consistently placed in the single digit percentiles of students nationally and that he was not progressing since his most recent results continued to place him at the second-grade level for math. R. 5901.

Further, even the evidence of W.H.'s strong grades in Math is undermined by the testimony of his teachers. Mr. Karam, W.H.'s Algebra I teacher, testified that he had not "seen much progress this school year" from W.H. R. 5169. Mr. Stacy, W.H.'s in-class support teacher for Algebra I, testified that W.H. had not progressed but rather needed "more and more help" as the term continued, and material became more difficult. R. 59-00. W.H. argues that the accommodation logs show that he did not require such a substantial level of support to justify resource placement, but both Mr. Karam and Mr. Stacy testified to the extreme level of support he needed both in terms of time in class and time spent modifying assignments. R. 5171-74, 5229-30, 5258, 5873-74. They also testified to his lack of understanding of the material and how his accommodations "pave[d] over the thought process of him using his brain to recall information." R. 5224. The result was that W.H.'s accommodations amounted to "resource instruction in the general education classroom" or a "class within a class." R. 5574-75, 5707-08.

W.H. contends that the amount of support he required in Math was "precisely because his assignments were not appropriately modified." ECF No. 19 at 19. However, the record provides several examples of the differences between his assignments and those of other students. R. 5876, 5881. W.H. argues that these alterations were insufficient because they did not reduce the expectations of the TEKS, but in practice, the state-level standards were altered for W.H. because

he did not have to understand the same concepts or independently think through the problems. R. 5891. Mr. Karam testified that, in his professional opinion, W.H. could not be successful in a general education class because he needed "much more one-on-one time, a slower pace of the lesson and more of a smaller class size." R. 5233-34. Mr. Stacy corroborated Mr. Karam's observations and testified that W.H. could not make "[p]rogress as far as actually the learning that's going on" or "having a thorough understanding" of the material in the general education classroom. R. 5901-02. Mr. Stacy also testified that, through the individualized math instructional plan, he essentially taught W.H. separately from the teacher and the rest of the class, but even with that specialized teaching, W.H. required near-constant attention and guidance to complete tasks and did not appear to understand the material. R. 5879-92.

In sum, the evidence reflects that W.H. was unable to grasp the essential elements of the regular education math curriculum even with numerous accommodations and in-class special education support. FBISD concluded that, despite W.H.'s grades and some progress on IEP goals, he was making insufficient academic progress in the general education setting. The preponderance of the evidence supports FBISD's position that W.H. was not receiving a meaningful educational benefit from the general education classroom in Math.

In English, W.H. received A's every term in seventh and eighth grade and in the first term of ninth grade. R. 794-96. There is marginally more evidence of progress in IEP goals in English than in Math, as his eighth grade IEP showed that he made progress towards mastering multiple goals. R. 820-21. Similarly, in the first term of ninth grade, his English teacher reported he made progress on his goals, he was expected to master some goals by his annual review, and the current goals continued to be appropriate. R. 849-51. On the other hand, his Renaissance 360 and STAAR scores showed that he was performing well below grade level and was in need of "urgent

intervention." R. 791-92, 1204-1205, 1488-1489, 1813-1814. In addition, W.H.'s Renaissance 360 results showed inconsistent progress and occasional regression as his instructional reading level increased to 4.2 at the end of eighth grade before decreasing to 3.6 at the beginning of ninth grade. R. 1488-89, 1813-14.

Mr. Barker, W.H.'s inclusion teacher for middle school English, stated that W.H. made progress on IEP goals in the areas of words per minute and accuracy during seventh and eighth grade. R. 5318-20. However, Mr. Barker also referred to W.H.'s performance with respect to fluency as a "roller coaster" during eighth grade. R. 5321. Mr. Barker further testified that, in his professional opinion, W.H. "required a resource setting" for English because of the amount of support he was receiving. R. 5351. Specifically, Mr. Barker referred to the "one-on-one with [W.H.], small group setting, incomplete assignments and just some modeling that [he] was doing with every assignment." *Id.* Through these accommodations, he was providing a level of support to W.H. that was not typical for in-class support teachers. R. 5358. He explained that the resource setting would benefit W.H. since he was able to better advocate for himself in small-group and one-on-one settings. R. 5360. Mr. Barker also testified about the alterations made to W.H.'s curriculum through prompting, modeling, and provision of sentence stems, and he gave an example of W.H.'s reliance on these supports to complete a writing assignment. R. 5368-71. He explained that W.H. required increased in-class support in eighth grade compared to seventh grade, and the level of support he needed remained consistently high throughout eighth grade. R. 5371, 5407-08.

In distinguishing W.H.'s educational benefit received in English compared to Math, the Hearing Officer pointed to the lower level of modification to W.H.'s English curriculum, the lower level and frequency of accommodations in English, and the lack of testimony that W.H. was in a

"classroom within a class" in English. Although the Court agrees that the level of curriculum modification and frequency of accommodations was higher in Math than English, the Court does not find this difference persuasive. Caselaw does not direct the Court to compare Math and English but rather to determine whether the modifications created a "fundamentally separate curriculum" such that W.H. could not "grasp the essential elements" of the regular education English curriculum. Also, the Court does not agree with the Hearing Officer that no witness characterized the level of in-class support for W.H. as creating a "classroom within a class." Instead, Ms. Byrne answered in the affirmative when asked if, based on her experience and Mr. Barker's testimony, she believed that W.H. was "starting to already receive what looks like resource instruction in the general education classroom." R. 5574. Therefore, a witness did refer to W.H.'s English instruction in eighth grade as equivalent to a "classroom within a class," and the difference drawn between English and Math on this point is illusory.

In sum, the Court finds that the evidence of educational benefit in English is similar to the evidence for Math. As in Math, the evidence reflects that W.H. was unable to grasp the essential elements of the regular education English curriculum even with numerous accommodations and in-class special education support. FBISD concluded that, despite W.H.'s grades and progress on IEP goals, he was making insufficient academic progress in the general education setting. The preponderance of the evidence supports FBISD's position that W.H. was not receiving a meaningful benefit from placement in the general education classroom in English.

### 2.  <u>Overall Educational Experience</u>

Next, the Court must consider W.H.'s overall educational experience in the mainstreamed environment and balance the benefits of regular and special education for him. *Daniel R.R.*, 874 F.2d at 1049. "For example, a child may be able to absorb only a minimal amount of the regular

35

education program, but may benefit enormously from the language models that his nonhandicapped peers provide for him." *Id.*

In Math, W.H. was working on a modified curriculum, needed near-constant one-on-one help from his inclusion teacher in the general education classroom, and required prompting and modeling to complete his tasks. In addition, the evidence shows that W.H. did not interact much with his nondisabled peers. R. 5229, 5234. Of course, the Fifth Circuit has recognized that students may benefit from observing the speech and other modeling behavior of peers even without direct interaction. But there is little evidence of such benefit here, and W.H. will still have access to such models even if educated in a resource setting for Math because other courses will be taught in the general education setting. Further, W.H.'s case manager observed that W.H. experienced shame in performing lower-level work than his typically developing peers in the general education classroom. R. 5290-94. Therefore, the social benefit from general education in Math is not clear, and W.H. will likely receive a greater benefit in the resource classroom.

In English, W.H. similarly required near-constant one-on-one help from his inclusion teacher as well as prompting and modeling to complete tasks. W.H.'s level of interaction with his nondisabled peers in English class is unclear, so it is possible that he received greater language and modeling benefits from interacting and observing his peers in English than in Math. However, on one occasion, W.H.'s case manager observed that he was a "little frustrated" in English class because of his inability to keep up with the material. R. 5293. As with Math, the social benefit from general education in English is not clear from the record.

Even with the limited record evidence, W.H.'s case does not seem to be one where the "benefit that the child receives from mainstreaming may tip the balance in favor of mainstreaming, even if the child cannot flourish academically." *Daniel R.R.*, 874 F.2d at 1049. Overall, the

preponderance of evidence suggests that W.H. would make greater academic progress in the resource setting, and through the proposed IEP, he would benefit from interaction with similar-ability peers in the resource setting while retaining the opportunity to learn alongside nondisabled peers in general education classes.

### 3. Effect on General Education Classroom

Finally, the Court must consider what effect W.H.'s presence has on the regular classroom environment and, thus, on the education that the other students are receiving. *Daniel R.R.*, 874 F.2d at 1049. It is undisputed that W.H. has never had behavioral issues in the general education classroom but is instead uniformly described as a sweet, respectful, and cooperative young adult. R. 763, 796, 5169, 5203-04, 5229, 5281. However, this factor also evaluates whether a disabled student requires so much attention that the teacher cannot properly serve other students because of the need to tend to the disabled child. "Although regular education instructors must devote extra attention to their [disabled] students, we will not require them to do so at the expense of their entire class." *Daniel R.R.*, 874 F.2d at 1051.

In Math, there is substantial evidence that W.H.'s needs required both Mr. Karam and Mr. Stacy to devote disproportionate amounts of time and attention to him. Mr. Karam testified that Mr. Stacy spent 70-75% of his time with W.H. and that he filled in when Mr. Stacy stepped away to assist other students. R. 5230-5231. Mr. Stacy agreed that he spent the "very large majority" of his time working with W.H. R. 5873-74. Mr. Karam also reported that W.H. needed assistance on nearly all assignments but would not request help until asked, meaning either he or Mr. Stacy constantly needed to check in on and assist him. R. 5229-5230, 5258. Mr. Karam even told FBISD administrators that it was difficult to accommodate the other special education students because of the amount of assistance that W.H. required. R. 5244. Mr. Stacy similarly reported difficulty

supporting the ten or eleven special education students in Algebra I because of W.H.'s needs. The preponderance of the evidence shows that W.H.'s significant need for support had a detrimental impact on the education of his fellow students.

In English, Mr. Barker testified that he spent 80-85% of class time working with W.H. R. 5406-08. Mr. Barker agreed that the remaining time was insufficient for him to meet the needs of the other four to five special education students in the class. R. 5408. However, there is little record evidence that W.H. took up a similarly disproportionate amount of the lead English teacher's time, so the Hearing Officer found, "the possible detriment to others in his ELA class was not as pronounced as it appeared in his math class. Or at least the evidence on this point did not suggest so." R. 18. Although the evidence is not as extreme as in Math, FBISD has presented sufficient evidence that W.H.'s needs had a detrimental impact on his fellow special education students in English.

Considering all of the factors holistically, the Court finds that, at the first step of the *Daniel R.R.* test, the preponderance of the evidence shows that W.H.'s education in the regular classroom, with the use of supplemental aids and services, cannot be achieved satisfactorily for Math or English.

### ii. Whether the school has mainstreamed the child to the maximum extent appropriate

At step two, the Court must consider whether FBISD has mainstreamed W.H. "to the maximum extent appropriate." *Daniel R.R.*, 874 F.2d at 1050. As the Fifth Circuit explained when discussing the IDEA's predecessor, Congress did not

> contemplate an all-or-nothing educational system in which handicapped children attend either regular or special education. Rather, the Act and its regulations require schools to offer a continuum of services. Thus, the school must take intermediate steps where appropriate, such as placing the child in regular education for some academic classes and in special education for others, mainstreaming the child for nonacademic classes only, or

providing interaction with nonhandicapped children during lunch and recess. The appropriate mix will vary from child to child and, it may be hoped, from school year to school year as the child develops.

*Id.* (internal citations omitted).

Here, W.H. has been primarily educated in the regular classroom but has long received dyslexia services in the resource classroom. The proposed IEP would alter the proportion of general to special education courses but would not remove him from the general education classroom altogether.

Based on the preponderance of the evidence, the Court concludes that the proposed IEP for the 2023-2024 school year *does* provide W.H. education in the least restrictive environment. The resource classroom is W.H.'s least restrictive environment for Math and English, and W.H. will continue to receive instruction in other courses in the general education classroom. Therefore, FBISD has mainstreamed W.H. to the maximum extent appropriate.

Returning to the *Michael F.* factors, the Court summarizes its findings: (1) the 2023-2024 IEP is individualized on the basis of W.H.'s assessment and performance, (2) the 2023-2024 IEP is administered in the least restrictive environment for Math and English, (3) the services have been provided in a coordinated and collaborative manner by the key stakeholders, and (4) positive academic and non-academic benefits have been demonstrated. The Court affirms the determination of the Hearing Officer that FBISD provided W.H. a free appropriate public education by proposing resource instruction for Math and reverses the determination of the Hearing Officer that FBISD denied a free appropriate public education by proposing resource instruction for English. Accordingly, the Court grants Defendant's Motion for Judgment on the Record and denies Plaintiff's Motion for Judgment on the Record.

### III.   SECTION 504 OF REHABILITATION ACT OF 1973 CLAIM

W.H. also brings a claim under Section 504 of the Rehabilitation Act of 1973 based on FBISD's failure to provide a free appropriate public education. Section 504 of the Rehabilitation Act provides: "No otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance. . . ." 29 U.S.C. § 794(a). FBISD moved for summary judgment on this claim.

### a.   Summary Judgment Standard

Summary judgment under Rule 56 "is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (quoting FED. R. CIV. P. 56(c)). A genuine issue as to a material fact arises "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court must draw all "reasonable inferences . . . in favor of the nonmoving party, but the nonmoving party 'cannot defeat summary judgment with conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence.'" *Hathaway v. Bazany*, 507 F.3d 312, 319 (5th Cir. 2007) (quoting *Turner v. Baylor Richardson Medical Center*, 476 F.3d 337, 343 (5th Cir. 2007)).

"[T]he movant bears the initial responsibility of demonstrating the absence of a genuine issue of material fact with respect to those issues on which the movant bears the burden of proof at trial." *Transamerica Ins. Co. v. Avenell*, 66 F.3d 715, 718 (5th Cir. 1995). "For any matter on which the non-movant would bear the burden of proof at trial, however, the movant may merely point to the absence of evidence and thereby shift to the non-movant the burden of demonstrating

by competent summary judgment proof that there is an issue of material fact warranting trial." *Id.* at 718–19.

### b. Section 504 Analysis

FBISD moved for summary judgment on W.H.'s Section 504 claim based on Fifth Circuit caselaw holding, when a plaintiff's Section 504 claim for compensatory damages is predicated on a disagreement over compliance with the IDEA, "facts creating an inference of professional bad faith or gross misjudgment are necessary to substantiate a cause of action for intentional discrimination under [Section] 504." *D.A. v. Houston ISD*, 629 F.3d 450, 455 (5th Cir. 2010). In that case, the Fifth Circuit held that in order "to establish a claim for disability discrimination, in th[e] education context, 'something more than a mere failure to provide the 'free appropriate education' required by [the IDEA] must be shown.'" *Id.* (quoting *Monahan v. Nebraska,* 687 F.2d 1164, 1170 (8th Cir. 1982)).

After FBISD filed its Motion for Summary Judgment on April 28, 2025, the Supreme Court clarified the legal standard for Section 504 claims. In *A. J. T. v. Osseo Area Schools, Independent School District No. 279*, the Supreme Court rejected the heightened "bad faith and gross misjudgment" standard. 145 S.Ct. 1647 (2025). The Court held "that ADA and Rehabilitation Act claims based on educational services should be subject to the same standards that apply in other disability discrimination contexts." *Id.* at 1655. Thus, the appropriate standard for Section 504 claims is deliberate indifference. *Id.* A plaintiff need not prove that the defendant had personal ill will or animosity toward the disabled person but must show that the defendant disregarded a strong likelihood that the challenged action would result in a violation of federally protected rights. *Id.*

Before the Supreme Court decision in *A. J. T. v. Osseo Area Schools, Independent School District No. 279*, both W.H. and FBISD agreed that, if the Court found that FBISD provided a free

appropriate public education in all respects, W.H.'s Section 504 claim would fail. ECF No. 18 at 31; ECF No. 21 at 16. In supplemental briefing filed after *A. J. T.*, neither party seemed to argue that the Supreme Court's decision altered that conclusion. In fact, W.H. emphasized the connection between his IDEA and Section 504 claims. ECF No. 31 at 3 ("Here, if Plaintiff prevails on his claims under the Individuals with Disabilities Education Act (the 'IDEA'), he will have shown that FBISD failed to provide him appropriate accommodations to allow him to remain within his least restrictive environment, thus excluding him from the significant benefits of that least restrictive environment."). Therefore, the Court finds that W.H.'s Section 504 claim fails as a matter of law because FBISD provided W.H. with a free appropriate public education in all respects.

In addition, W.H.'s Section 504 claim fails even if the Court evaluates it under the newly clarified deliberate indifference standard. Under that standard, W.H.'s Section 504 claim requires him to establish that (1) he is a qualified individual with a disability within the meaning of Section 504 of the Rehabilitation Act; (2) he was excluded from participation in, or was denied benefits of, services, programs, or activities for which the school district is responsible; (3) his exclusion, denial of benefits, or discrimination was by reason of his disability; and (4) the exclusion, denial of benefits, or discrimination was intentional. *Harrison v. Klein Indep. Sch. Dist.*, 856 Fed. Appx. 480, 483 (5th Cir. 2021). For a claim asserting FBISD's failure to make reasonable accommodations for disability, W.H. must show that (1) his disability and limitations were known by the school district; (2) the school district failed to make reasonable accommodations for the known limitations; and (3) the failure was intentional. *Id.* As the Supreme Court explained in *A. J. T.*, the "intentional" element of the claim can be satisfied by evidence establishing deliberate indifference.

The Fifth Circuit has explained that deliberate indifference is a "high bar." *Sanches v. Carrollton-Farmers Branch Indep. Sch. Dist.*, 647 F.3d 156, 167 (5th Cir. 2011). "Because deliberate indifference is a lesser form of intent rather than a heightened degree of negligence, neither negligent nor merely unreasonable responses are enough." *I.F. v. Lewisville Indep. Sch. Dist.*, 915 F.3d 360, 369 (5th Cir. 2019) (internal quotations and citations omitted). Instead, to clear the "high bar" of proving deliberate indifference, the challenged action must be "clearly unreasonable in light of the known circumstances." *Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 648 (1999); *Sanches,* 647 F.3d at 167. The Supreme Court and the Fifth Circuit "recognize that in ruling on a motion for summary judgment, a district court can determine, as a matter of law, that a party was not deliberately indifferent." *I.F.*, 915 F.3d at 369.

Here, the record reflects that FBISD's decision to place W.H. in a resource classroom for Math in English was not clearly unreasonable in light of the known circumstances. As discussed above, FBISD based its IEP decision on a careful analysis of W.H.'s assessments and performance over years in the general education classroom, and FBISD collaborated with key stakeholders in the ARD process. In opposition to summary judgment, W.H. makes conclusory statements that "FBISD has sought to use the extent of burdensome accommodations, which its own personnel deemed unnecessary, and the scope of interactions with and demands by Plaintiff's guardian—demands for which Plaintiff himself had no responsibility—to justify excluding Plaintiff from his least restrictive environment" and that FBISD engaged in a "convoluted effort to penalize Plaintiff by excluding him from his appropriate environment as a mechanism for pushing back against the demands of his guardian." ECF No. 21 at 15. However, W.H. presents no disputes of material fact on these issues, and the Court has already determined that FBISD made its placement decisions with W.H.'s education as its priority. Therefore, the Court concludes there is no genuine dispute

43

of material fact as to whether FBISD was deliberately indifferent. Accordingly, W.H.'s Section 504 claim fails, and the Court grants Defendant's Motion for Summary Judgment.

## IV.    CONCLUSION

On W.H.'s IDEA claim, Defendant's Motion for Judgment on the Administrative Record is **GRANTED**, and Plaintiff's Motion for Judgment on the Administrative Record is **DENIED**.

On W.H.'s Section 504 claim, Defendant's Motion for Summary Judgment is **GRANTED**.

**IT IS SO ORDERED.**

**SIGNED** at Houston, Texas on this the 29th day of July, 2025.

KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE